## EAGLE COTTON OIL CO. v. SOUTHERN RY. CO. et. al.

District Court, S. D. Mississippi, E. D.

Feb. 5, 1931.

brought under section 16 of the Interstate Commerce Act as amended (49 USCA § 16), and is based on an order of the Interstate Commerce Commission, made and entered on November 11, 1929, in the case of Eagle Cotton Oil Company v. Southern Railway Company et al., being Interstate Commerce Commission docket No. 17485. In that order the Interstate Commerce Commission directed the defendants herein to pay to plaintiff herein the sum of $3,283.01 as reparation on numerous shipments of coal from mines in what is known as the Birmingham district to Meridian, Miss. The defendants, having refused to pay the award of reparation, plaintiff filed this suit and asks judgment in the sum of $5,083.01, which includes the amount of $3,283.01 as above stated, interest in the sum of $750, and attorneys' fee for $1,050.

A special plea was filed by defendants to the declaration in which it was alleged that the order of the Interest Commerce Commission, upon which this suit is based, was void and of no effect in so far as the reparation ordered and adjudged therein is concerned, because (1) the said rate of $2.03, which was held by the Interstate Commerce Commission to be unreasonable and excessive, was a rate which had theretofore been fixed and prescribed as a reasonable and lawful rate by the said Interstate Commerce Commission; and (2) the Interstate Commerce Commission is without power or jurisdiction to award and require defendants to pay reparation for the collection of rates on any shipments which moved prior to the effective date of the rate established as reasonable for the future by said order of March 9, 1928. Issue was joined on the special plea.

In order to properly understand the issues in this case, it is necessary to set out briefly the evidence of record. At the time the complaint was filed before the Interstate Commerce Commission in docket 17485, the rate on coal to Meridian, Miss., from mines in the Birmingham district was $2.03 per ton. The Eagle Cotton Oil Company, in behalf of itself and various interveners, filed a complaint in which it was alleged that the rate of $2.03 was unreasonable and in violation of sections 1, 2, 3, and 4 of the Interstate Commerce Act (49 USCA §§ 1–4). The complaint was heard on March 8, 1926. As a result of the decision of the Commission of March 9, 1928, 140 I. C. C. 131, the Birmingham group was disrupted. In other words, the Commission prescribed, as reasonable, rates of $1.85 and $1.95 per ton. The rate of $1.85 was to ap-

E. B. Williams, of Meridian, Miss., for plaintiff.

Joseph P. Cook, of Washington, D. C., and Baskin, Wilbourn & Miller and Bozeman & Cameron, all of Meridian, Miss., for defendants.

COX, District Judge.

This suit was tried by the court under a written stipulation waiving a jury. It is

1008

ply from Southern Railway groups Nos. 2 and 5, and the rate of $1.95 was to apply from Southern Railway groups Nos. 1, 3, and 4. In its decision the Commission condemned the $2.03 rate as unreasonable and awarded reparation on past shipments. The evidence shows that the $2.03 rate resulted from a rate which the Interstate Commerce Commission prescribed on July 22, 1915, in its decision in Coal and Coke Rates in the Southeast, Investigation and Suspension Docket No. 569, 35 I. C. C. 187. It appears in that case that the carriers proposed a rate of $1.25 from mines in the Birmingham district to Meridian, Miss. The Commission, after a thorough investigation, found that $1.25 was not a reasonable rate, and found that $1.20 would be reasonable for the transportation of coal from mines in the Birmingham district to Meridian, Miss. The evidence further discloses that the $2.03 rate resulted from this $1.20 rate, which the Interstate Commerce Commission prescribed in the case just mentioned. The method by which the $1.20 rate became $2.03 is shown by evidence of record. In the steps by which the rate of $1.20 finally became $2.03, the evidence shows that none of the increases or decreases resulted from the action of defendants, but resulted solely from the action of the Interstate Commerce Commission or the Director General of Railroads.

The evidence that the $2.03 rate was made and prescribed as a reasonable rate by the Interstate Commerce Commission is uncontroverted. In fact, the Interstate Commerce Commission in its decision in 140 I. C. C. 131, recognized that "it is true that the rate assailed resulted from a rate prescribed in Coal and Coke Rates in the Southeast, 35 I. C. C. 187." In its decision in Coal from Illinois, Kentucky and Alabama to Alabama, Mississippi, Tennessee, Arkansas, Louisiana, and Texas, 128 I. C. C. 113, decided May 25, 1927, the Commission again approved the reasonableness of the rate of $2.03 from the Birmingham district to Meridian, Miss. There is no doubt in my mind that the $2.03 rate, which was found to be unreasonable, was a rate which was prescribed by the Interstate Commerce Commission as a reasonable and lawful rate.

1. The power of the Interstate Commerce Commission with respect to awards of reparation rests principally under section 8 of the Interstate Commerce Act (49 USCA § 8). Section 8 of the act provides as follows: That, "in case any common carrier subject to the provisions of this chapter shall do, cause to be done, or permit to be done any act, matter, or thing in this chapter prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this chapter required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this chapter, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs in the case."

It will be observed from the above that the Commission is empowered to award reparation where there has been a violation of the Interstate Commerce Act by the carriers or that the rate charged and collected or act complained of has been unlawful or in contravention of some provision of the act. The Commission and courts have repeatedly held that its power to award damages can only be exercised when a violation of the act has occurred.

In the case of New Pittsburgh Coal Co. v. H. V. Ry. Co. 26 I. C. C. 121, at page 126, the Commission said: "There can be no doubt, we think, that we are without authority to award reparation in any case unless we can conclude that the rate assailed was in violation of the act at the time the shipments in question moved."

Also in the case of Pittwood v. N. P. Ry. Co., 51 I. C. C. 535, the Commission said: "This Commission has power to award damages only when they are suffered in consequence of a violation of the act to regulate commerce."

Again, in the case of News Syndicate Co. v. N. Y. C. R. Co., 275 U. S. 179, 48 S. Ct. 39, 40, 72 L. Ed. 225, the court said: "The Commission has jurisdiction to determine whether plaintiff in error was entitled to an 'award of damages under the provisions of this act for a violation thereof.'"

The Interstate Commerce Act requires the carriers to observe and comply with the orders of the Commission, and heavy penalties are provided should a carrier knowingly neglect to obey any order of the Commission made under the provisions of sections 3, 13, or 15 of the act (49 USCA §§ 3, 13 or 15). Rates filed with the Commission have the force of a statute. The rate on file is the only lawful charge, and deviation from it is not permitted under any pretext. Shippers and carriers alike are bound by it. Louisville & Nashville R. Co. v. Maxwell, 237 U. S. 94, 35 S. Ct. 494, 59 L. Ed. 853, L. R. A. 1915E,

665. When the rate is filed in compliance with an order of the Commission, the carriers are not permitted to charge anything more or less. If they do, they are subject to the penalties of the act. Rates which the Commission has theretofore approved and prescribed, which have been filed and published with all legal formalities, and which have been charged and collected without protest from shippers, certainly cannot be reduced as to the past, and any order of such import is a mere nullity. The Interstate Commerce Commission is not given anywhere in the Interstate Commerce Act authority to make a retroactive finding challenging a rate which it has approved and prescribed. It cannot retroactively strike down and annul a rate which it has formerly passed upon and expressly approved. The Commission cannot condemn in 1929 a rate which it fixed and approved in 1915 and subsequently reapproved, and which was promulgated with its sanction. If such power existed, regulation would result in confiscation. One illustration will suffice to show this. Assume, for instance, a railroad whose earnings largely depend upon one commodity. A coal-carrying road is an apt illustration. The revenues of this road depend upon coal which we will assume is 80 per cent. of its traffic. We will further assume that, after an investigation the Interstate Commerce Commission has fixed the rate to be charged on this coal. This rate has remained in effect for a number of years without complaint from any shipper. A tremendous amount of tonnage has moved on said rate. The revenues derived from said rate have been distributed in the payment of dividends and interest on bonds; taxes have been paid; betterments have been made. Can it be contended that the Interstate Commerce Commission has the power to later on declare that the rate was unlawful and unreasonable and then require the carrier to make reparation on every single shipment which moved on said rate? Such a condition would result in chaos. The great transportation systems of this country could not exist in such circumstances. What method has been adopted, or could be adopted, by which the carriers could be expected to raise the money to pay the reparation which had been expended? No system of accounting or bookkeeping has been devised or could be devised by which such contingency could be provided for. If the carriers cannot use the revenues received from the charging of a rate which the Interstate Commerce Commission has declared to be reasonable and lawful, it is clear to this court that it would result in chaos in the finances and credit of the carriers and would likewise result in breaking down the stability in rate structures which was one of the cardinal reasons for the passing of the Interstate Commerce Act.

2. The court's attention has not been directed to any decision involving this principle in so far as it applies to the Interstate Commerce Act. However, there are a number of court decisions upon this question, and in each one of these decisions it was held that a rate once approved by a regulatory body is conclusively presumed to be reasonable, and its collection, therefore, cannot be held to have been unlawful, and therefore no reparation may be awarded against such rate. These decisions all involve the rate powers of various state commissions. See Mathieson Alkali Works, Inc., v. Norfolk & Western Railway Company et al., 147 Va. 426, 137 S. E. 608; T. R. Miller Mill Company v. Louisville & Nashville Railroad Company, 207 Ala. 253, 92 So. 797, 802; Northern Pacific Railway Co. v. Department of Public Works et al., 136 Wash. 389, 240 P. 362; Producers' Refining Co. v. M. K. & T. R. R. Co. of Texas (Tex. Com. App.) 13 S.W.(2d) 679; Producers' Refining Co. v. M. K. & T. R. R. Co. of Texas (Tex. Com. App.) 13 S.W.(2d) 680; Young Heading Co. v. Payne (1921) 127 Miss. 48, 89 So. 782; Texas & Pacific Ry. Co. v. Railroad Commission of Louisiana, 137 La. 1059, 69 So. 837; M. K. & T. R. R. Co. v. Railroad Commission (Tex. Civ. App.) 3 S.W.(2d) 489.

The above cases all hold that a regulatory body is not authorized to make an order at one time to operate prospectively and return to the same subject-matter later after the carriers have complied with the order and award reparation on charges legally established as unjust and unreasonable. In the language of the court in the case of T. R. Miller Mill Company v. Louisville & N. R. Co., supra: "Such a practice would be odious to the generally established notions of justice, and would, moreover, be utterly subversive of the policy and utility of any system of rate regulation; for no rate could be relied upon as stable, and neither carrier nor shipper could ever be certain of the basis upon which business was being conducted. For it must be observed that, under such a practice, the Commission would just as well find that a rate approved and imposed by it years before was in fact unreasonably low, and give retroactive operation to the higher rate later found to have

**1010**

been reasonable. Of course * * * no such power was vested in the Commission."

Therefore the judgment should be for defendants.